**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ERWIN WARD,** | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | **Case No.:**   2:24-cv-432 |
| | : | |
| **UNIVERSAL STAINLESS AND ALLOY** | : | |
| **PRODUCTS, INC.** | : | |
| | : | |
| *Defendant*. | : | |

**COMPLAINT IN CIVIL ACTION**

AND NOW, comes Plaintiff, Erwin Ward, by and through the undersigned counsel, J.P.

Ward & Associates, LLC, and, specifically, Joshua P. Ward, Esquire, who files the within

Complaint in Civil Action against Defendant, Universal Stainless and Alloy Products, Inc., of

which the following is a statement:

**PARTIES**

1. Plaintiff, Erwin Ward (hereinafter "Mr. Ward" or "Plaintiff"), is an adult

individual who currently resides at 2224 Mannor Ave, Swissvale, PA, 15218.

2. Defendant, Universal Stainless and Alloy Products, Inc. (hereinafter "Universal"

or "Defendant"), is a Delaware corporation with a principal place of business located at 600

Mayer Street, Bridgeville, PA 15017.

**JURISDICTION AND VENUE**

3. This action arises under Section 1981 of the Civil Rights Act of 1866 ("Section

1981"), 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000e et seq. the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951-963, and

common law wrongful termination for violation of a clear mandate of public policy under the Occupational Safety and Health Act, 29 U.S.C. § 651, et seq.  "OSHA."

4.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

5.    Plaintiff is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 25 U.S.C. § 1391(b).

6.    On March 7, 2023, Plaintiff dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC").

7.    On December 27, 2023, the EEOC issued a Notice of Right to Sue.

8.    Plaintiff has exhausted all his administrative remedies under Title VII.


## FACTUAL ALLEGATIONS

9.    In November of 2018, Mr. Ward began his employment with Universal in the position of Head Shearman.

10.    Universal's Bridgevlle plant produces specialty steel products in the form of finished flat bar, long products and flat rolled products including certain grades of electro-slag remelted steels and vacuum-arc remelted steels.

11.    At all times relevant, Mr. Ward is an African American individual who was qualified to perform the essential functions of his job duties.

12.     Mr. Ward was one of three African American employees that were disciplined and/or wrongfully terminated within weeks of one another by the same group of managers in the Bloomer Department.  J.P. Ward & Associates, LLC represents Erwin Ward, Stefan Cooper, and Anthony Upshaw.

13.     Upon information and belief, Universal has a pattern and practice of disparate treatment toward its African American employees, at a minimum, within the management of the Bloomer Department.

14.     Universal employs a disproportionately small number of African American employees and further, subjects its African American employees to heightened scrutiny which results in a high turnover rate.

15.     Universal allowed its managers, white employees, and supervisors to discriminate against its African American employees.

16.     Mr. Ward was a victim of Universal's openly bigoted practices, perpetrated by certain personnel within management, as set forth herein.

   a.   **Universal allowed established policies and rules to be changed in order to benefit its white employees.**

17.     Universal has a process called "rolling," in which the last four employees hired were required to stay and work overtime.

18.     "Rolling" was supposed to be based on an employee's seniority; however, Universal changed its policy so that the supervisors decided who was required to stay to work overtime regardless of seniority.

19.    Mr. Ward and another African American employee were regularly forced to stay and work overtime although there were similarly situated white employees who were hired after them that were allowed to go home without working overtime.

20.    Upon information and belief, Universal changed its policy in order to benefit the similarly situated white employees who were hired after Mr. Ward.

21.    Mr. Ward reported this disparate treatment to Universal's Human Resources Department and his Union; however, neither party took affirmative action to correct the discriminatory policy.

b.    **Universal forced its African American employees to work in unsafe working conditions.**

22.    Mr. Ward's duties included several which required two or more people to safely complete.

23.    However, Universal regularly forced African Americans to perform such job duties individually without an extra person.

24.    Universal did not force similarly situated white employees to complete a two or more-person job without the proper assistance.

25.    Mr. Ward consistently asked his supervisors for help performing a two or more-person job duty.

26.    However, Mr. Ward's supervisors continuously ignored his requests for help.

27.    Mr. Ward reported this dangerous practice to Human Resources and the Union.

28.    Universal and the Union again failed to take corrective action to remedy the situation.

4

29. Additionally, Mr. Ward was forced to work with a broken Pegasus heater charger, which put his safety at risk.

30. Similarly situated white employees were not forced to work with a broken Pegasus heater charger.

31. On August 2, 2022, Mr. Ward was disciplined for refusing to operate in unsafe conditions.

c. **Universal retaliated against Mr. Ward for his reports of racial discrimination and safety violations.**

32. In August 2022, Mr. Ward made a complaint to the Occupational Safety and Health Administration (hereinafter "OSHA") concerning the safety violation.

33. While waiting to hear from OSHA, Mr. Ward was brought into a meeting with Union Representative, Rod LNU (hereinafter "Mr. Rod"), and Floor Supervisor, Andrew LNU (hereinafter "Mr. Andrew").

34. During this meeting, Mr. Ward made Mr. Rod and Mr. Andrew fully aware of the continuous racial discrimination, hostile work environment, and safety issues he was subjected to work in at Universal.

35. Mr. Ward additionally made Mr. Rod and Mr. Andrew aware of his OSHA complaint regarding the safety violation.

36. After this meeting, Universal retaliated against Mr. Ward by subjecting him to a heightened level of harassment, forcing him to perform additional job duties, and frequently requiring him to stay after scheduled working hours.

37. Mr. Ward contacted Union Representative Jim Wyatt (hereinafter "Mr. Wyatt") in order to file grievances regarding the racial discrimination, hostile work environment, retaliation, and safety issues filed with OSHA.

38. Upon information and belief, Mr. Wyatt failed to file any grievances on behalf of Mr. Ward.

### d. Universal terminated Mr. Ward for in retaliation of his complaints of racial discrimination and safety violations.

39. On September 8th, 2022 Mr. Ward once again made complaints about this safety issue to the Union and to Human Resources.

40. Mr. Ward was tasked with operating the Pegasus charger buggy on his

41. Mr. Ward told Universal Floor Supervisors, Cody LNU (hereinafter "Mr. Cody") and Michael Harmon (hereinafter "Mr. Harmon") that he needed another experienced Shearman in order to safely complete the task and specifically asked for Dillon Pareso (hereinafter "Mr. Pareso").

42. Mr. Cody and Mr. Harmon blatantly ignored Mr. Ward's request for Mr. Pareso to assist him in completing the job duty.

43. Because his request was being ignored by Mr. Cody and Mr. Harmon, Mr. Ward called Mr. Pareso twice on his own accord.

44. Prior to starting the job, Mr. Ward went to the restroom while he waited for Mr. Pareso to arrive in his work area.

45. When Mr. Ward arrived back to his work area, Mr. Pareso was not yet present.

46. Mr. Ward subsequently utilized to the loudspeaker and called for Mr. Pareso to come to his work area.

47.    Mr. Harmon immediately came out of his office and went directly over to Mr. Ward's work area, accusing Mr. Ward of being insubordinate for refusing to endanger himself by completing the job duty without a second person.

48.    As such, Mr. Harmon sent Mr. Ward home for the rest of the workday.

49.    On September 9, 2022, Universal unlawfully terminated Mr. Ward under the pretextual reasoning of insubordination for failing to follow Mr. Harmon's direct order.

50.    Upon information and belief, Mr. Pareso, a similarly situated white individual, was tasked with completing a two or more-person job the following day and was given another person to assist him.

51.    Incredibly, in its Position Statement filed with the EEOC/PHRA, Universal admits that they fired Mr. Ward because he made this safety complaint to a supervisor, which they mistakenly characterized as "insubordination."   Rather, it is protected activity and in no instance can retaliation serve as an appropriate means to address or resolve a safety complaint from an employee in a high risk industrial setting.

52.    Upon information and belief, Universal discriminated against Mr. Ward based on his race, and retaliated against Mr. Ward for his complaints of racial discrimination and safety violations as a means of silencing him and others within the Bloomer Department.

## COUNT I

**Common Law Wrongful Termination - Violation of a Clear Mandate of Public Policy by Failure to Provide Safe Work Environment, and Retaliatory Termination, in Violation of Pennsylvania's General Safety Law, 43 Pa. Stat. § 25-1 et seq.**

*(Plaintiff vs. Defendant)*

53.    Mr. Ward incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

54.     In the Commonwealth of Pennsylvania, "as a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship." *Mikhail v. Pennsylvania Org. for Women in Early Recovery*, 63 A.3d 313, 316 (Pa. Super. 2013).

55.     However, an at-will employee "will be entitled to bring a cause of action for a termination of that relationship . . . where the termination implicates a clear mandate of public policy in the Commonwealth of Pennsylvania." *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287 (Pa. 2000).

56.     Pennsylvania courts define public policy "by reference to the laws and legal precedents and not from supposed public interest." *Id*. at 288.

57.     Pennsylvania's General Safety Law protects the safety, health, and morals of persons while employed by prescribing regulations and restrictions concerning places where persons are employed.

58.     "The term 'establishment' shall mean any room, building or place within this Commonwealth where persons are employed or permitted to work for compensation of any kind to whomever payable, except farms or private dwellings, and shall include those owned or under the control of the Commonwealth, and any political subdivision thereof, as well as school districts." 43 Pa. C.S.A. § 25-1.

59.     There is a 'general duty clause' contained at Section 25-2, subsection (a), which states: "All establishments shall be so constructed, equipped, arranged, operated, and conducted as to provide reasonable and adequate protection for the life, limb, health, safety, and morals of all persons employed therein." 43 Pa. C.S.A. § 25-2.

60.     More specifically, Section 25-2, subsection (b), states: "All belts, pulleys, gears, chains, sprockets, shafting, and other mechanical power transmission apparatus, stationary

8

engines, electrical equipment, and apparatus shall be properly guarded to protect workers from injury." 43 Pa. C.S.A. § 25-2.

61.     More specifically, Section 25-2 (c) is directly on point, which states, "(c) All cranes, hoists, steam or electric shovels, plant railroads, and other apparatus or devices used for moving, lifting, lowering, and transporting material shall be designed, constructed, equipped, and operated as to eliminate dangerous conditions." 43 Pa. C.S.A. § 25-2.

62.     Additionally, Section 25-5 states: "The floor space of workrooms in any establishment shall not be so crowded with machinery as to thereby cause risk to the life or limb of any employe. Proper clear aisle space shall be maintained where necessary for employes to walk between machines, equipment or material. Machinery shall not be placed in any establishment in excess of the sustaining power of the floors and walls thereof." 43 Pa. C.S.A. § 25-5.

63.     Mr. Ward engaged in a protected activity when he filed a complaint with OSHA regarding safety violations against Defendant, and when he made internal complaints regarding a host of unsafe conditions and practices of Defendant.

64.     Defendant forced Mr. Ward and the similarly situated African American employees to work with a broken Pegasus heater charger. The broken Pegasus heater charger would have caused serious bodily injury to the operator.

65.     Mr. Ward also reported that his co-worker's refusal to assist him in performing two-man tasks created an unsafe condition, which he also reported.

66.     Mr. Ward made numerous reports of the safety issues related to the Pegasus heater charger to Defendant's Human Resources Department and supervisors.

67.     Defendant failed to correct the safety issues.

9

68.     In turn, Mr. Ward filed a complaint with OSHA concerning the Pegasus heater charger and the many safety violations.

69.     When Defendant became aware that Mr. Ward involved OSHA, it retaliated against Mr. Ward with a heightened level of harassment, forced him to perform additional job duties, and frequently required him to stay after working hours.

70.     On September 9, 2022, Defendant terminated Mr. Ward 's employment under the pre-textual reasoning of insubordination.

71.     As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

72.     As a direct and proximate cause of the aforementioned conduct, Mr. Ward suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

WHEREFORE, Plaintiff, Erwin Ward, hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendant, including an award of back pay, front pay, compensatory damages, punitive damages, costs and attorney's fees.

## COUNT II

## RACIAL DISCRIMINATION IN VIOLATION OF SECTION 1981

73.     Mr. Ward incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

74.     42 U.S.C. § 1981(a) provides that:

All persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws …as is enjoyed by white citizens.

*Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975) (holding that Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race."); *see also*, *Comcast Corp. v. Natl. Assn. of African Am.-Owned Media*, 140 S. Ct. 1009, 1010 (2020).

75.    Thus, Section 1981 prohibits employers from engaging in intentional racial discrimination.

76.    Defendant perpetuated the racial discrimination of Mr. Ward in the workplace as delineated hereinabove.

77.    Mr. Ward was held to a more arduous standard than his white counterparts and was disparately treated by his supervisors based on his race.

78.    Defendant was made aware of Mr. Ward's harassment and disparate treatment based on his race, yet his reports fell on deaf ears and Universal failed to take any investigative or corrective action.

79.    On September 9, 2022, as a result of this racial discrimination, Mr. Ward was subjected to the ultimate adverse employment action when he was terminated and therefore deprived of the same right to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

80.    Defendant's actions against Mr. Ward were undertaken with reckless indifference to his federally protected right to make and enforce contracts irrespective of his race.

81.    As a direct and proximate result of the aforementioned conduct, Mr. Ward suffered actual damages, including, but not limited to, lost wages, benefits, emotional distress, anxiety, loss of reputation, loss of professional opportunities, humiliation and severe inconvenience all in the past present and future.

82.     As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, Erwin Ward, hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendant, including an award of front pay, back pay, compensatory and punitive damages, costs and reasonable attorney's fees.

.

## COUNT III

### RETALIATORY TERMINATION
### IN VIOLATION OF SECTION 1981

83.     Mr. Ward incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

84.     The Third Circuit has held that retaliation claims under Section 1981 are controlled by the three-step burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973); *see also Canada v. Samuel Grossi & Sons*, 49 F.4th 340 (3d Cir. 2022) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008) (holding that § 1981 "encompasses claims of retaliation")).

85.     Under the first step of that framework, a plaintiff "must establish a prima facie case by showing '(1) [that he engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. Of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (alteration in original) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

86.     Upon making these showings, the employer then, under step two, has the burden of producing evidence that "present[s] a legitimate, non-retaliatory reason for having taken the

adverse action." *Daniels*, 776 F.3d at 193. If the employer meets this burden, the burden then shifts "back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* (quoting *Moore*, 461 F.3d at 342).

87.     Mr. Ward engaged in protected activity by reporting racial discrimination and opposing the discriminatory practices of Defendant.

88.     Following Mr. Ward's reports, Defendant subjected Mr. Ward to additional harassment and forced him to work additional hours outside of his regular schedule.

89.     On September 9, 2022, Mr. Ward faced an adverse employment action when Defendant terminated his employment.

90.     The was a causal connection between Mr. Ward's protected activity and Defendant's adverse employment action.

91.     As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

92.     As a direct and proximate cause of the aforementioned conduct, Mr. Ward suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

WHEREFORE, Plaintiff, Erwin Ward, hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendant, including an award of front pay, back pay, compensatory and punitive damages, costs and reasonable attorney's fees.

## COUNT IV

### RACIAL DISCRIMINATION IN VIOLATION
### OF TITLE VII AND THE PHRA

93.     Mr. Ward incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

94.     Under Title VII, it is illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. §2000e-2(a)(1).

95.     When analyzing a claim of discrimination under Title VII, a plaintiff must show: "(1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably or the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Langley v. Merck & Co.*, 186 Fed Appx. 258 (3d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 36 L. E.D. 29 668 (1973); *see also*, *Makky v. Chertoff*, 542 F.3d 205, 214 (3d Cir. 2008).

96.     The same legal standards apply to Title VII and PHRA claims. *Connelly v. LaneConstr. Corp.*, 809 F.3d 780, 791 (3d Cir. 2016) (citing *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 (3d Cir. 2000)). Further, the same standards apply to claims under Title VII and the PHRA on a summary judgment motion. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). Accordingly, the Court's analysis of the Title VII claims also applies to the PHRA claims. *Phillips v. Septa*, CIVIL ACTION NO. 16-0986, 6-7 (E.D. Pa. Feb. 12, 2018).

14

97.    Pennsylvania courts have determined that an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Serv*., 390 F.3d 760, 764 (3d Cir. 2004)).

98.    Under Title VII, for other employees to be considered "similarly situated," they must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Morales v. Pnc Bank, N.A.*, 2012 U.S. Dist. LEXIS 143605 *23 (E.D. Pa. 2012).

99.    Pennsylvania courts have held that comparison factors for "similarly situated employees" have included "dealing with the same supervisor, having been subject to the same standards, and engaging in the same conduct without differentiating and mitigating circumstances." *Id.*

100.    Mr. Ward was an African American employee and was highly qualified for his position.

101.    Mr. Ward suffered an adverse employment action when he was regularly forced to work additional hours, forced to work under unsafe conditions, and was terminated for his complaints of racial discrimination.

102.    Similarly situated white employees were not subjected to the same additional hours or unsafe working conditions.

103.    On September 9, 2022, Mr. Ward was terminated by Defendant under the pretextual reasoning of insubordination.

104.    Mr. Ward was unlawfully terminated due to his race and complaints of racial discrimination.

105. As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

106. As a direct and proximate cause of the aforementioned conduct, Mr. Ward suffered actual damages, including, but not limited to, lost wages, benefits, emotional distress, anxiety, loss of reputation, loss of professional opportunities, humiliation and severe inconvenience, all in the past, present and future.

WHEREFORE, Plaintiff, Erwin Ward, hereby requests that this Honorable Court enter judgment in his favor, and against Defendant, including compensatory damages, punitive damages, injunctive relief, costs and attorney fees, in addition to such other relief as deemed just and proper.

## COUNT V

### RETALIATION IN VIOLATION
### OF TITLE VII AND THE PHRA

107. Mr. Ward incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

108. To establish a prima facie case of retaliation under Title VII, a plaintiff must provide evidence that: (1) he "engaged in activity protected by Title VII"; (2) the employer took an "adverse employment action" against him; and (3) there was a "causal connection" between his "participation in the protected activity and the adverse employment action." *Kengerski v. Allegheny Cty.*, 435 F. Supp. 3d 671, 676 (W.D. Pa. 2020) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006); *see also*, *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

16

109.    The analytical framework used to evaluate a claim under the PHRA is effectively indistinguishable from that under Title VII. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999).

110.    Pennsylvania courts have determined that an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Serv.*, 390 F.3d 760, 764 (3d Cir. 2004)).

111.    "When the temporal proximity between the protected activity and adverse action is unduly suggestive, this is sufficient standing alone to create an inference of causality…" *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 307 (3d Cir.2012) (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3rd Cir.2007)).

112.    Mr. Ward engaged in an activity protected by Title VII by reporting racial discrimination and opposing the discriminatory practices of Defendant.

113.    Following Mr. Ward's reports, Defendant subjected Mr. Ward to additional harassment and forced him to work additional hours outside of his regular schedule.

114.    On September 9, 2022, Mr. Ward faced an adverse employment action when Defendant terminated his employment.

115.    The was a causal connection between Mr. Ward's protected activity and Defendant's adverse employment action.

116.    As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

117.   As a direct and proximate cause of the aforementioned conduct, Mr. Ward suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

WHEREFORE, Plaintiff, Erwin Ward, hereby requests that this Honorable Court enter judgment in his favor, and against Defendant, including compensatory damages, punitive damages, injunctive relief, costs and attorney fees, in addition to such other relief as deemed just and proper.

J.P. WARD & ASSOCIATES, LLC

Date: March 21, 2024                    By: _____

Joshua P. Ward (Pa. I.D. No. 320347)

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

*Counsel for Plaintiff*