IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERWIN WARD,

      Plaintiff,

  vs.

UNIVERSAL STAINLESS AND ALLOY
PRODUCTS, INC.,

      Defendant,

2:24-CV-00432-CCW

## OPINION

Plaintiff Erwin Ward claims that his former employer, Defendant Universal Stainless and Alloy Products, Inc., discriminated against him on the basis of his race (African American) and retaliated against him for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act ("PHRA"), and 42 U.S.C § 1981.[1]  Universal moves for summary judgment on all claims.  ECF No. 54.  Relatedly, Universal moves to strike Mr. Ward's Responsive Concise Statement of Material Facts, ECF No. 68.  ECF No. 70.  For the reasons that follow, the Court will grant both Motions.

## I.   Motion to Strike Plaintiff's Responsive Concise Statement of Material Facts

Universal argues that Mr. Ward failed to comply with Federal Rule of Civil Procedure 56(c)(1) and with Local Rule 56.C.1 and moves to strike Mr. Ward's Responsive Concise Statement of Material Facts, ECF No. 68, and have its own Concise Statement of Material Facts

---

[1] The Court has jurisdiction over Mr. Ward's Title VII and § 1981 claims, which raise federal questions, under 28 U.S.C. § 1331 and may exercise supplemental jurisdiction over his state-law claim under 28 U.S.C. § 1367.

("DSOMF"), ECF No. 55, deemed admitted.[2] ECF No. 71. Mr. Ward did not respond to the Motion to Strike.

The Western District of Pennsylvania's Local Rules specifically require a party opposing a motion for summary judgment to file a responsive concise statement of material fact that responds to each numbered paragraph in the movant's concise statement by (1) admitting or denying the facts asserted in the movant's concise statement; (2) setting forth the basis for any denial, to the extent a fact is not admitted entirely, with appropriate citation to the record; and (3) setting forth, in separately numbered paragraphs, any other material facts at issue. *See* LCvR 56.C.1. Courts in this district "require strict compliance with the provisions of Local Rule 56." *Mattis v. Overmyer*, No. 1:16-cv-00306, 2019 WL 2542283, at *2 (W.D. Pa. June 20, 2019) (collecting cases). A non-moving party "faces severe consequences for not properly responding to a moving party's concise statement[,]" namely, that any fact claimed to be undisputed in the moving party's concise statement "'will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.'" *Hughes v. Allegheny Cnty. Airport Auth.*, No. 15-221, 2017 WL 2880875, at *1 (W.D. Pa. July 6, 2017) (quoting LCvR 56.E).

---

[2] In addition to his responses to the DSOMF, Mr. Ward also included in ECF No. 68 his own statement of additional facts (the "PSOMF"), *see* ECF No. 68 at 106–143. Universal seeks to strike Mr. Ward's response to the DSOMF, ECF No 68 at 1 –105, but does not expressly seek to strike his statement of additional facts. *See* ECF No. 70. But, in its reply in support of summary judgment, Universal asks in passing for the Court to strike Mr. Ward's statement of additional facts as well. ECF No. 72 at 1. The Court agrees with Universal that the PSOMF suffers from many of the same defects as Mr. Ward's response to the DSOMF. Specifically, numerous statements in the PSOMF contain legal and factual arguments. *See, e.g.*, ECF No. 68 ¶¶ 95, 106, 119, 199, 233. Others lack any citation to the record, *id*. ¶¶ 206, 208, 218, 233. However, Universal did not fully develop its arguments regarding the PSOMF's noncompliance with the federal and local rules, or file a separate motion to strike the PSOMF. Therefore, the Court declines to strike the PSOMF on this limited record. Nevertheless, the shortcomings in Plaintiff's statement of additional facts, plus additional shortcomings in Plaintiff's briefing, have made the Court's review of the record very difficult in this case. For example, Plaintiff's Brief in Opposition to Summary Judgment does not cite to either DSOMF or Plaintiff's own PSOMF. Rather, where it includes citations to the record, they are to specific depositions or documents, rather than to the parties' statements of facts. Therefore, it is difficult for the Court to discern from the briefing whether a matter is disputed between the parties, and if so, whether that dispute is material.

The Court agrees with Universal that Mr. Ward's Responsive Concise Statement is wildly noncompliant with Fed. R. Civ. P. 56 and with Local Rule 56.C.  As Universal points out in its Motion to Strike, ECF No. 71, Mr. Ward's submission contains:  (1) substantial amounts of superfluous content that is not responsive to the corresponding paragraph in the DSOMF;  (2) numerous factual assertions without reference to the record;  and (3) numerous factual and legal arguments that should have been raised in a legal brief, not a statement of material facts.  *See, e.g.*, ECF No. 68 ¶¶ 10, 11, 14, 55, 70, 93, 117 (superfluous assertions not responsive to corresponding paragraph in DSOMF);  *id*. ¶¶ 18, 20, 37, 39, 68, 85, 129 (factual assertions without reference to the record);  *id.* ¶¶ 7, 55, 66, 77, 110, 117, 130, 135 (factual and legal arguments).  Indeed, while the DSOMF is 23 pages long, Mr. Ward's Responsive Concise Statement is 105 pages long.  *See* ECF Nos. 55, 68.  And some of Mr. Ward's "responses" to single paragraphs in the DSOMF are over a full page in length.  *See e.g.*, ECF No. 68 ¶ 39.

When a party fails to properly address facts presented in an opposing party's statement of material facts, both the Federal Rules of Civil Procedure and the Local Rules allow those facts to be deemed admitted.  *See Walter v. McDonaugh*, No. 2:22-CV-01213-MJH, 2024 WL 4025877, at *3 (W.D. Pa. Sept. 3, 2024) (Horan, J.) (striking noncompliant CSOMF which "fail[ed] to admit or deny various facts set forth in . . . SOMF," failed to "cite to any record evidence," and which "ma[de] many legal arguments" and deeming opposing party's CSOMF admitted);  *see also Byron v. Columbia Gas of Pa.*, No. 2:21-cv-1365-CCW, ECF No. 32 at 2–3 (W.D. Pa. December 2, 2022) (Wiegand, J.) (deeming admitted facts in CSOMF opposed with boilerplate, citationless responses).  Because Mr. Ward's Responsive Concise Statement so substantially fails to comply with Fed. R. Civ. P 56 and with Local Rule 56.C, the Court concludes that it is appropriate to strike

3

it in its entirety and deem Universal's Statement of Facts admitted. Having resolved Universal's Motion to Strike, the Court now turns to Universal's Motion for Summary Judgment.

## II.    Material Facts

The following facts are drawn from Universal's Concise Statement of Material Facts, ECF No. 55, unless otherwise noted.

Universal produces specialty steel products at its facility in Bridgeville, Pennsylvania (the "Bridgeville facility" or the "plant"). In November 2018, Universal hired Mr. Ward, who is African American, to work as a "stamper" at the Bridgeville facility. DSOMF ¶¶ 16, 17, 20. Mr. Ward eventually became a forklift operator at the plant, and then a shear operator. *Id.* ¶¶ 23–24. In March 2022, Mr. Ward began training as a "heater/charger." *Id.* ¶ 27. Heater/chargers are responsible for loading steel into furnaces, heating the steel, and then unloading the steel from the furnace so that it can be processed in the mill. *Id.* ¶¶ 30–31. Heater/chargers use "charger buggies" to transport steel to and from the furnace. *Id.* ¶ 33.

While training in the heater/charger role, Mr. Ward reported to a supervisor named Mike Harmon. *Id.* ¶¶ 15, 35. Mr. Harmon reported to the operations manager at the plant, Andrew Matthews. *Id.* ¶¶ 12, 14. Mr. Matthews reported to the plant manager, Jeffrey Graeber, who in turn reported to Universal's vice president of manufacturing, Wendel Crosby. *Id.* ¶¶ 8–13.

On August 2, 2022, Mr. Ward was training as a heater/charger with a colleague, Anthony Upshaw, when the charger buggy he and Mr. Upshaw were using broke down. *Id.* ¶¶ 34, 36. Messrs. Ward and Upshaw were instructed to use another charger buggy, known as "the Pegasus," that had recently been removed from service for maintenance. *Id.* ¶ 37. But Mr. Ward expressed concern that the Pegasus was not safe to use and refused to operate it. *Id.* ¶¶ 39–40; ECF No. 57-7 at 43–44. Universal's corporate director of environmental, health and safety, Michael Alderson,

and a technician from Burns Industrial, Universal's third-party maintenance provider, then examined the Pegasus and determined that it was safe to operate. DSOMF ¶¶ 41–43; ECF No. 57-5 at 122. Tyson Rebecca, a maintenance supervisor, also informed Mr. Ward that the Pegasus was safe to operate. DSOMF ¶ 45; ECF No. 57-7 at 45.

After these employees deemed the Pegasus safe for use, Wendel Crosby instructed Andrew Matthews to direct Messrs. Ward and Upshaw to begin operating the Pegasus. DSOMF ¶¶ 46–47. But when Mr. Matthews instructed Mr. Ward to operate the Pegasus, Mr. Ward refused. *Id.* ¶¶ 48–49, 51; ECF Nos. 57-5 at 122, 271–72; 57-7 at 42. When Mr. Crosby learned that Mr. Ward continued to refuse to operate the Pegasus, Mr. Crosby decided to impose a five-day suspension and a last-chance agreement for insubordination. DSOMF ¶¶ 53–54. Mr. Ward signed a written notice of the 5-day suspension, which stated that "[a]ny additional infractions or violations will be cause for immediate termination[,]" on August 16, 2022.[3] *Id.* ¶ 55; ECF No. 57-7 at 47–49.

Subsequently, on August 23, 2022, Mr. Ward was disqualified from training as a heater/charger during a meeting with Mr. Matthews, Mr. Graeber, and Jeffrey Astle, the President of Mr. Ward's union (the "disqualification meeting"). DSOMF ¶¶ 60–61. During the meeting, Mr. Ward received a written disqualification notice which detailed multiple reasons for his disqualification as a heater/charger, including that Mr. Ward was unable to competently perform the required functions of a heater/charger, had taken unapproved time off, and had been found sleeping at work on two occasions. *Id.* ¶ 64; ECF No. 57-7 at 51–55. Mr. Matthews testified that, during the disqualification meeting, Mr. Ward complained that "he felt he was being treated differently because of his race." DSOMF ¶ 122; ECF No. 57-5 at 82, 163. After the disqualification meeting, Mr. Matthews informed Mr. Ward that he was being assigned back to

---

[3] Mr. Ward did not serve the five-day suspension due to the plant's operational needs. *Id.* ¶¶ 56–57.

the shear. DSOMF ¶ 66. Mr. Ward told Mr. Matthews he would prefer to return to his position as a stamper. *Id*. ¶ 67. During his deposition, Mr. Ward explained that he did not want to train another employee on the shear who would then progress into higher positions at the plant and earn more money than he did. *Id.* ¶ 68; ECF No. 57-7 at 62, 67.

On August 25, 2022, Mr. Matthews held a meeting with Mr. Ward, Mr. Graeber, and Rod Shy, Mr. Ward's union representative, to discuss Mr. Ward's next assignment. DSOMF ¶ 70. During that meeting it was agreed that, rather than returning to the shear, Mr. Ward would take a "two-day look"—essentially, a trial run—at an assignment in the milling department. *Id*. ¶ 71. However, during Mr. Ward's two-day look in the milling department, Mr. Crosby determined that reassigning Mr. Ward to the milling department violated the plant's collective bargaining agreement ("CBA"), which requires employees to bid on positions in different departments. *Id*. ¶ 73–74. Mr. Crosby informed Mr. Graeber that Mr. Ward's two-day look in the milling department violated the CBA, and Messrs. Matthews and Shy then informed Mr. Ward that he was being reassigned back to the shear. *Id*. ¶ 76.

On September 8, 2022, Mr. Ward was instructed to train another employee, Mike Woodson, on the shear. *Id.* ¶ 77. Mr. Ward refused. *Id*. ¶ 78; ECF No. 57-7 at 61. Instead, Mr. Ward went on the plant's intercom system (also referred to as the "Femco" or the "Terry phone") and requested that another employee, Dylan Pareso, come to the shear to train Mr. Woodson. DSOMF ¶ 78; ECF No. 57-7 at 61–62. Cody Anderson, one of the supervisors at the plant, told Mr. Ward that Mr. Pareso was unable to come to the shear. DSOMF ¶ 79. Mr. Ward then returned to the intercom and, using profanity, demanded that Mr. Pareso come to the shear and stated that he would not train Mr. Woodson and would instead "shut everything down . . . and wait for his

union rep."[4]   *Id*. ¶ 80;   ECF No. 57-7 at 68–69.   After hearing Mr. Ward's broadcast on the intercom, Mike Harmon approached Mr. Ward and instructed him to train Mr. Woodson on the shear.   DSOMF ¶ 81.   Mr. Ward again refused.   *Id*.   Mr. Harmon then instructed Mr. Ward to leave the plant for insubordination.   *Id*. ¶ 82.

News of Mr. Ward's outburst soon began to circulate.   Mr. Harmon contacted Mr. Matthews and informed him of the incident while hourly employees at the plant contacted Mr. Crosby to inquire why production had ceased.   *Id.* ¶¶ 83–84.   Mr. Crosby then called Mr. Matthews and directed him to assist Mr. Harmon in escorting Mr. Ward out of the plant.   *Id.* ¶ 85.   Mr. Matthews did so, and informed Mr. Ward that his conduct constituted insubordination and that he would be terminated.   *Id.* ¶ 86.   After escorting Mr. Ward out of the plant, Messrs. Matthews and Harmon took statements from the employees who heard Mr. Ward's outburst on the intercom, and Mr. Matthews advised Mr. Crosby that Mr. Ward's conduct constituted insubordination and recommended that Mr. Ward be terminated.   *Id.* ¶¶ 87–88, 90.   Mr. Crosby terminated Mr. Ward's employment the next day, September 9, 2022.   *Id.* ¶¶ 90, 92;   ECF No. 57-7 at 69.

Universal now moves for Summary Judgment on all of Mr. Ward's claims.   ECF No. 54.  The Motion is fully briefed and ripe for resolution.   ECF Nos. 56, 67, 72.

III.   **Legal Standard**

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"   *Razak v. Uber Techs., Inc.*, 951

---

[4]At his deposition, Mr. Ward denied that he threatened to "shut everything down" on the intercom, but admitted that he demanded that Mr. Pareso come to the shear, PSOMF ¶ 212, announced that he would not train anyone, that he was using his "seniority card," that he would do "nothing," and that he would "lay the fuck down and wait for his union rep."   ECF No. 57-7 at 68–69.

F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'"

*Id.* (quoting *Anderson*, 477 U.S. at 248).  "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *NAACP

v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (alteration omitted) (quoting

*Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The burden to establish that there is no genuine dispute as to any material fact "remains

with the moving party regardless of which party would have the burden of persuasion at trial."

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (internal quotation marks

omitted).  Furthermore, "[i]f the non-moving party bears the burden of persuasion at trial, 'the

moving party may meet its burden on summary judgment by showing that the nonmoving party's

evidence is insufficient to carry that burden.'"  *Kaucher v. Cnty of Bucks*, 455 F.3d 418, 423 (3d

Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment

"must do more than simply show that there is some metaphysical doubt as to the material facts. . .

. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87.  Thus, while "[t]he

evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his

favor[,]" *Anderson*, 477 U.S. at 255, "Rule 56(e) . . . requires the nonmoving party to go beyond

the pleadings" and point to "'specific facts showing that there is a genuine issue for trial.'"  *Celotex

Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted).  But, while the court must "view the

facts in the light most favorable to the non-moving party and draw all reasonable inferences in that

party's favor . . . to prevail on a motion for summary judgment, the non-moving party must present

8

more than a mere scintilla of evidence. . . ." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal citations omitted).  Instead, "there must be evidence on which the jury could reasonably find for the non-movant." *Id.* (cleaned up).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 requires the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23;  *Jakimas v. Hoffmann La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

## IV.   Discussion

### A.   Legal Framework

The parties agree that the familiar *McDonnell Douglas* burden-shifting framework applies to Mr. Ward's disparate treatment claims under Title VII (Count IV), the PHRA (Count IV), and § 1981 (Count II) and to Mr. Ward's retaliation claims under Title VII (Count V), the PHRA (Count V), and § 1981 (Count III).[5]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973);  *Burton*, 707 F.3d at 425–27;  ECF Nos. 56 at 7, 67 at 2.

The *McDonnell Douglas* analysis has three steps.  First, the plaintiff must point to evidence sufficient to satisfy the elements of a prima facie case of employment discrimination or retaliation, thereby creating an inference that the employer acted unlawfully.  *See Burton*, 707 F.3d at 426. Next, the defendant must rebut this inference by articulating a legitimate, non-discriminatory reason for its actions.  *See id.*  The burden of production then shifts back to the plaintiff, who, in order to survive summary judgment, must provide evidence from which a jury could reasonably

---

[5] Mr. Ward also asserted a claim for wrongful termination in violation of a clear mandate of public policy under Pennsylvania common law (Count I).  ECF No. 1 at 7–10.  Mr. Ward dismissed his wrongful termination claim with prejudice on April 2, 2025.  ECF No. 51.

infer that the defendant's proffered explanation for its conduct is, in reality, pretext for unlawful discrimination or retaliation. *See id.* at 426–27; *see also Fuentes v. Perskie*, 32 F.3d 759, 763–64 (3d Cir. 1994) (setting forth burden shifting framework under *McDonnell Douglas* at summary judgment). Although the *McDonnell Douglas* framework contemplates a shifting burden of *production*, the burden of *persuasion* always remains with the plaintiff. *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009).

Additionally, while it is true that the United States Supreme Court has held that to prevail on a § 1981 claim a plaintiff must ultimately "prove that but for his race, he would not have been discriminated against," *Williams v. Tech Mahindra (Americas) Inc.*, 70 F.4th 646, 651 (3d Cir. 2023) (citing *Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 589 U.S. 327, 589 U.S. at 341), and that this is a higher causal burden than is required for Title VII disparate treatment claims, *Comcast*, 589 U.S. at 337–38, the *McDonnell Douglas* framework still governs Mr. Ward's § 1981 claims. *See Tech Mahindra*, 70 F.4th at 651. Thus, to survive summary judgment, a § 1981 plaintiff need only present evidence that tends to show that her race was the "likely reason for the adverse [employment] action. . . . To hold otherwise 'would be tantamount to eliminating the *McDonnell Douglas* framework[.]'" *Onely v. Redner's Markets, Inc.*, 697 F. Supp. 3d 410, 421 (E.D. Pa. 2023) (quoting *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017)) (analyzing Title VII and § 1981 disparate treatment claims together). Finally, because the Third Circuit has found that "[c]laims under the PHRA are interpreted coextensively with Title VII claims[,]" the Court will address Mr. Ward's federal and state-law claims in tandem. *Atkins v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

B.    **Universal is Entitled to Summary Judgment on Mr. Ward's Disparate Treatment Claims (Counts II, IV)**

Mr. Ward asserts that Universal discriminated against him on the basis of his race when it imposed the five-day suspension and then terminated him. ECF No. 1. Universal asserts that Mr. Ward cannot make out a prima facie case of race discrimination and that, even if he could, he cannot show that Universal's reasons for disciplining and firing him were a pretext for discrimination. ECF No. 56.

1.    **Mr. Ward Cannot Establish a Prima Facie Case**

To prove a prima facie case of employment discrimination, a plaintiff must show that (1) he is a member of a protected class, (2) that he was qualified for the position he sought to attain or retain, (3) that he suffered an adverse employment action, and (4) the action occurred under circumstances that support an inference of intentional discrimination. *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018). The parties dispute only the fourth element—whether Mr. Ward's discipline and termination occurred under circumstances that support an inference of intentional discrimination.[6] ECF Nos. 56, 67.

To show an inference of intentional discrimination, a plaintiff may either:

---

[6] Universal concedes that the five-day suspension Mr. Ward received and his subsequent termination each constitute adverse actions. ECF Nos. 56 at 8. But the Complaint alleges that, in addition to disciplining and terminating Mr. Ward, Universal took additional adverse action against him, such as "forc[ing]" Mr. Ward "to work additional hours . . . under unsafe conditions." ECF No. 1. ¶ 101. The Court agrees with Universal that the record does not contain evidence which would allow a reasonable jury to conclude that Universal forced Mr. Ward to work beyond his scheduled hours or in unsafe conditions. For example, Mr. Ward testified at his deposition that, at some time in "late 2020 and '21 [and] [p]robably a little bit of '22 too[,]" he was forced to work beyond his scheduled stop time on at least one occasion when a less senior colleague, whose identity he does not recall, was allowed to leave. DSOMF ¶ 99–101. Even if such "'vague, self-serving statements' which are unsupported by specific facts in the record" were sufficient for a reasonable juror to find Universal forced Mr. Ward to work additional hours, which they are not, Mr. Ward would still fail to show that these actions occurred under circumstances supporting an inference of intentional discrimination, for the reasons set forth below. Additionally, Mr. Ward's briefing focuses on the circumstances surrounding his five-day suspension and termination and offers no arguments regarding a causal connection between these other alleged adverse actions and his membership in a protected class. Accordingly, the Court will not consider these alleged adverse actions further. *See Wingard v. Pennsylvania State Police*, No. 12-cv-1500, 2013 WL 3551109, at *7 (W.D. Pa. July 11, 2013) (Bissoon, J.) ("The Court need not consider arguments that have not been developed by the party advancing them.").

11

> (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action.

*Drummer v. Hospital of Univ. of Pennsylvania*, 455 F. Supp. 3d 160, 168 (E.D. Pa. 2020) (citing *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014)).  Here, Mr. Ward points both to evidence of a comparator and to circumstantial evidence.  ECF No. 67 at 4– 5, 14–15.  Universal contends that the purported comparator is not similarly situated to Mr. Ward and that Mr. Ward's circumstantial evidence is insufficient to show a causal nexus between his discipline and termination and his membership in a protected class.  ECF No. 56 at 12–15.

Mr. Ward proffers Dylan Pareso as a comparator.  In support, Mr. Ward asserts that Mr. Pareso, a white employee, refused to operate plant equipment due to safety concerns in June 2022. ECF No. 67 at 12–13;  PSOMF ¶ 239.  Mr. Ward further asserts that, while Universal initially issued Mr. Pareso a write-up for insubordination for his refusal to operate the equipment, Universal later withdrew the write-up and apologized to Mr. Pareso.  PSOMF ¶ 240.  According to Mr. Ward, Mr. Pareso was also later involved in a physical altercation with another employee but was not terminated or disciplined.[7]  ECF No. 67 at 13;  PSOMF ¶ 243.

The record demonstrates that there was an occasion on which Mr. Pareso refused to operate a shear at the Bridgeville facility over concerns the shear was malfunctioning and, thus, unsafe to operate.  DSOMF ¶¶ 127–131;  ECF No. 57-5 at 71.  The record also shows that, after Mr. Pareso raised his concerns to management, management consulted with the relevant safety and maintenance employees.  DSMOF ¶¶ 131–134;  ECF No. 57-5 at 72.  After examining the shear,

---

[7] Mr. Ward's brief also references "another white comparator, Dan Gately," who allegedly "told management to 'fuck off' and was not fired[.]"  ECF No. 67 at 13.  But Mr. Ward provides no further information to suggest that Mr. Gately was similarly situated to Mr. Ward.

the safety and maintenance employees determined it was safe for use and Mr. Pareso resumed operating the shear. DSOMF ¶¶ 131-134; ECF No. 57-5 at 73–74.

While a comparator need not be "identically situated" to the plaintiff, "the comparator must be similar in all relevant respects." *Durst v. City of Philadelphia*, 798 F. App'x 710, 713 (3d Cir. 2020) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003)). Mr. Pareso, like Mr. Ward, was qualified as a shearman. DSMOF ¶ 107. Mr. Pareso, like Mr. Ward, also refused to operate a charging buggy that he was concerned was unsafe to use. *Id.*¶¶ 38–40. And when Mr. Ward expressed his concern to management, management consulted with the relevant safety and maintenance personnel, just as it did when addressing Mr. Pareso's safety concerns. *Id*. ¶¶ 41–45. But, unlike Mr. Pareso, Mr. Ward continued to refuse to operate equipment after it had been deemed safe for use. *Id*. ¶¶ 46–51. Mr. Ward is thus not similarly situated to Mr. Pareso. *Durst*, 798 Fed. App'x at 713 (finding that comparator was not similarly situated where their alleged misconduct was not similar to plaintiff's); *Dennison v. Ind. Univ. Pa.*, No. 20-cv-1563, 2022 WL 3213657, at *9 (W.D. Pa. Aug. 9, 2022) (Horan, J.) (explaining that comparators must be "sufficiently comparable[,]" and they are not so when the facts and circumstances leading to the discipline are different for the comparators).

Turning next to the circumstantial evidence supporting a causal nexus, the Court finds that Mr. Ward fails to identify evidence that would allow a reasonable jury to conclude that there was a causal nexus between his discipline and termination and his membership in a protected class. Mr. Ward's briefing argues that "the record reveals a workplace environment in which racial discrimination was normalized, tolerated, and left unaddressed by both Human Resources and management." ECF No. 67 at 3. But, despite such sweeping and conclusory statements, Mr. Ward only offers one concrete example of an incident in which he claims an employee, supervisor Mike

Harmon, was accused of using discriminatory language.  Mr. Ward argues the record contains evidence that Mr. Harmon, one of Mr. Ward's supervisors, was accused by Brian Jackson, an African American employee at the plant, of using the N-word.  ECF No. 67 at 4–5, 14.  Mr. Ward claims Mr. Jackson made this allegation about Mr. Harmon during a conflict resolution between Messrs. Jackson and Harmon in late 2022 or in 2023, *after* Mr. Ward's termination.  *Id.*;  PSOMF ¶ 92.

Universal disputes whether the record supports Mr. Ward's contention that Mr. Jackson accused Mr. Harmon of using the n-word during the conflict resolution meeting.  ECF No. 72 at 2.  But even if the allegation against Mr. Harmon was well-supported in the record, which the Court finds doubtful at best,[8] it would not be enough to show a causal nexus between Mr. Ward's discipline and termination and his race.  First, this supposed allegation was made after Mr. Ward left Universal.  Second, and more importantly, the allegation does not in any way relate to Mr. Ward or his termination.  *See  Goodson v. Cigna Ins. Co.*, No. 85-0476, 1988 WL 52086, at *9 (E.D. Pa. May 20, 1988) ("One way in which the plaintiff has tried to prove discrimination is through indirect or circumstantial evidence. It is possible to do so, *provided that the evidence bears some connection to the alleged discrimination*.") (emphasis added).  Indeed, this single, unfounded allegation against Mr. Harmon amounts to even less than "a collection of stray remarks and

---

[8] Universal argues that Jeff Astle did not testify that Mr. Jackson accused Mr. Harmon of using the N-word.  ECF No. 72 at 2.  Rather, Universal argues Mr. Astle testified that he "inferred" this allegation.  *Id*.  The Court reviewed the transcript of Mr. Astle's deposition, and Mr. Astle testified that, during the conflict resolution meeting, which Mr. Astle was present for, Mr. Harmon first told Mr. Jackson that "I really don't like it when you call me the N-word." Mr. Astle testified that Mr. Jackson then responded to Mr. Harmon by stating that, "well, you know, that's a two-way street." ECF No. 74-2 at 89.  Mr. Astle understood this as an allegation that Mr. Harmon had previously used the N-word.  Mr. Ward also claims in his briefing that Mr. Crosby and HR manager Katrina Caldwell testified that they were aware of Mr. Jackson's allegation against Mr. Harmon.  ECF No. 67 at 14–15.  The Court has reviewed the cited portions of both deposition transcripts, which do not support Mr. Ward's assertions.  Mr. Crosby testified that he "wasn't involved" in the conflict resolution meeting between Messrs. Jackson and Harmon.  ECF No. 69-9 at 285–87.  Nowhere in the cited portion of the deposition transcript does Mr. Crosby testify that he had any knowledge of this alleged incident.  And Ms. Caldwell explicitly testified that she did not remember Mr. Jackson or any grievance related to Mr. Jackson's supposed allegation against Mr. Harmon.  ECF No. 69-5 at 78–79.  The Court is dismayed that counsel has misrepresented the deponents' testimony to the Court.

14

unconnected, coincidental circumstances" that "does not a causal nexus make." *Greene*, 557 F. App'x at 196. Accordingly, Mr. Ward cannot point to any evidence from which a reasonable jury could conclude that the circumstances surrounding his termination and discipline support an inference of intentional discrimination.

### 2. Mr. Ward Cannot Establish That Universal's Proffered Reasons Were a Pretext for Discrimination.

But even if Mr. Ward could establish a prima facie case of discrimination, Universal offers a legitimate, nondiscriminatory reason for the decision to impose a 5-day suspension and to terminate his employment—Mr. Ward's repeated insubordination.[9] *See Maurizio v. Fox Chapel Foods, Inc.*, No. 02: 04CV1168, 2006 WL 2571397, at *6 (W.D. Pa. Sept. 5, 2006) (McVerry, J.) ("Insubordination and/or misconduct is a legitimate, non-discriminatory cause for termination."). It is undisputed that Mr. Ward was repeatedly insubordinate. First, it is undisputed that on August 2, 2022, Mr. Ward refused a directive from Andrew Matthews to operate the Pegasus charger buggy and subsequently received a five-day suspension for insubordination.[10] DSOMF ¶¶ 54–55. That refusal led Mr. Crosby to issue a five-day suspension against Mr. Ward. *Id.* ¶ 54. Second, it is undisputed that, on September 8, 2022, Mr. Ward repeatedly refused a directive to train another employee on the shear and, using profanity, broadcast his refusal over the plant's intercom. DSOMF ¶ 77–80; PSOMF ¶ 234; ECF No. 57-7 at 61–62, 67–69. Thus, Universal has sufficiently proffered a legitimate, non-discriminatory reason for suspending and terminating Mr. Ward.

---

[9] Although Mr. Ward expressly states in his briefing that he "does not concede that Universal has identified a legitimate, nondiscriminatory reason for [his] termination[,]" ECF No. 67 at 18, he acknowledges that he engaged in nearly all of the underlying conduct.

[10] Mr. Ward disputes whether his conduct on August 2, 2022 constituted insubordination. ECF No. 67 at 7–8. Specifically, Mr. Ward asserts that, while Mr. Matthews instructed Messrs. Ward and Upshaw to resume operating the Pegasus charger buggy after it was cleared for use, Mr. Matthews did not inform the employees that the instruction to operate the Pegasus had been given to Mr. Matthews by Mr. Crosby. *Id.* But Mr. Ward does not dispute that Mr. Matthews was his supervisor, DSOMF ¶¶ 12, 14–15, or that he refused Mr. Matthews' directive to resume operating the Pegasus after it was cleared for use by maintenance and safety. *Id.* ¶¶ 47–51; ECF No. 57-7 at 42–44. Refusing Mr. Matthews' directive was therefore, by definition, insubordination.

Furthermore, Mr. Ward cannot establish that Universal's legitimate, nondiscriminatory reason was pretext for discrimination. To show an employer's proffered reasons for acting against an employee were pretext for discrimination, a plaintiff must offer some direct or circumstantial evidence from which a factfinder could reasonably (i) disbelieve the employer's stated reasons for their action, or (ii) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *In re Tribune Media Co.*, 902 F.3d at 402; *Fuentes v. Perskie*, 32 F.3d at 764. A plaintiff can show that an invidious discriminatory reason was more likely than not a motivating factor where "the employer treated other . . . similarly situated persons not of [his] protected class more favorably." *In re Tribune Media Co.*, 902 F.3d at 403.

Here, nothing in the record would allow a reasonable factfinder to disbelieve Universal's stated reason for Mr. Ward's termination. As explained, Mr. Ward repeatedly was insubordinate. And nothing in the record suggests an invidious discriminatory reason, rather than that repeated insubordination, was the reason Universal disciplined and terminated Mr. Ward. Mr. Ward's attempt to characterize Dylan Pareso as a comparator fails to establish pretext, because Mr. Pareso did not refuse an order to operate equipment that management deemed safe for use. DSOMF ¶ 132. And Mr. Ward's allegation regarding the conflict resolution meeting between Mr. Harmon and Mr. Jackson also fails to establish pretext, because it lacks support in the record, occurred after Mr. Ward's employment at Universal ended, and is entirely unrelated to Mr. Ward and the circumstances surrounding his termination. *See Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 389 (E.D. Pa. 2013) ("Under Third Circuit precedent, 'stray remarks' unconnected from an adverse employment decision are insufficient to show invidious purpose.") (quoting *Hodczak v. Latrobe Specialty Steel Co.*, 451 F. App'x 238, 241 (3d Cir. 2011)). Thus, even if Mr. Ward could establish

16

a prima facie case of disparate treatment, he cannot point to evidence that would support a reasonable finding that Universal's legitimate, non-discriminatory reason for disciplining and firing him was a pretext for discrimination.[11]

> **C.** **Universal is Entitled to Summary Judgment on Mr. Ward's Retaliation Claim (Count III)**

Mr. Ward asserts that Universal terminated him on September 9, 2022 in retaliation for his complaints about the discriminatory treatment of African American employees at the Bridgeville facility. ECF No. 1. Universal argues Mr. Ward cannot establish a prima facie case of retaliation and that, even if he could, he cannot establish that Universal's reasons for firing him were pretextual. ECF No. 56.

> **1.** **Mr. Ward Cannot Establish a Prima Facie Case**

To establish a prima facie case of retaliation, a plaintiff must show that (a) he engaged in a protected activity, (b) the employer took materially adverse action against him, and (c) there was a causal connection between the protected activity and the employer's action. *Young v. City of Phila. Police Dept.*, 651 F. App'x 90, 95 (3d Cir. 2016) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340–42 (3d Cir. 2006)). Here, the parties dispute the first and third elements—whether Mr. Ward engaged in protected activity and whether there was a causal connection between the protected activity and his termination.

> **a.** **Mr. Ward Engaged in a Protected Activity by Alleging Disparate Treatment of African American Employees**

---

[11] Mr. Ward also contests whether the appropriate personnel cleared the Pegasus for use and claims that Mr. Matthews initially opposed imposing the five-day suspension on Mr. Ward, but that Mr. Matthews was overridden by Mr. Crosby. ECF No. 67 at 7–8. But merely critiquing the wisdom of Universal's decision to discipline Mr. Ward cannot establishment pretext. *See Fuentes*, 32 F.3d at 765 ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

17

Universal contests whether Mr. Ward's complaint at the August 23, 2022 disqualification meeting that he was experiencing discriminatory treatment was sufficiently specific to constitute a protected activity under Title VII, the PHRA, and § 1981. ECF No. 56 at 15–16. Mr. Matthews testified that, during the disqualification meeting, Mr. Ward "more or less loudly exclaimed that he felt he was being treated differently because of his race." DSOMF ¶ 122.

The Third Circuit has held that "protected activity includes not only formal charges of discrimination, but also 'informal protests of discriminatory employment practices, including making complaints to management.'" *Mammen v. Thomas Jefferson Univ.*, 523 F. Supp. 3d 702, 714 (E.D. Pa. 2021) (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Del.*, 450 F.3d 130, 135 (3d Cir. 2006)). However, "[c]omplaints must be specific enough to notify the employer of the particular type of discrimination being opposed, and allow the employer to discern that the employee opposes an unlawful practice." *Caplan v. L Brands/Victoria's Secret Stores, LLC*, 210 F. Supp. 3d 744, 754 (W.D. Pa. 2016), *aff'd sub nom. Caplan v. L Brands/Victoria's Secret Stores*, 704 F. App'x 152 (3d Cir. 2017).

The Court finds that a reasonable jury could conclude that Mr. Ward's statement at the disqualification meeting was sufficiently specific to put Universal on notice of the type of discrimination Mr. Ward opposed—the disparate treatment of African American employees. Accordingly, Mr. Ward can show that he engaged a protected activity.[12]

---

[12] Mr. Ward's Complaint alleges Universal terminated him for making complaints of racial discrimination and for making safety complaints, including filing an OSHA report. ECF No. 1 ¶¶ 51–52, 63. However, complaints about alleged safety violations are "not protected activities under Title VII, the PHRA, and § 1981." *Fields v. Am. Airlines, Inc.*, 696 F. Supp. 3d 66 (E.D. Pa. 2023), *aff'd* No. 23-2962, 2024 WL 3534478, at *2 (3d Cir. July 25, 2024). Accordingly, Mr. Ward cannot proceed on a retaliation claim based on those complaints. Additionally, Mr. Ward alleges that he made "numerous" complaints about race discrimination at the plant to human resources manager Lecia Caldwell prior to his complaint at the disqualification meeting. ECF No. 67 at 5. But Mr. Ward offers no details about the timing or content of these alleged prior complaints of race discrimination, let alone any arguments regarding a causal connection between the alleged prior complaints and his subsequent discipline and termination. Accordingly, the Court will not consider these alleged complaints further.

####    b.    Mr. Ward Cannot Establish a Causal Connection Between the Protected Activity and His Termination

A plaintiff may point to "a broad array of evidence" to demonstrate a causal link between the protected activity and the adverse action, including a "temporal proximity between the protected activity and the adverse action [that] is unusually suggestive" or evidence of "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232–33 (3d Cir. 2007) (cleaned up).

Universal argues that Mr. Ward cannot show a causal connection between his complaint of discriminatory treatment and his termination, because the ultimate decisionmaker behind Mr. Ward's termination, Wendell Crosby, was unaware that Mr. Ward had complained of discriminatory treatment during the disqualification meeting. ECF No. 56 at 17. Mr. Ward contends he can show a causal connection under a "cat's paw" theory of liability, in which Mr. Crosby "relied on the tainted input of biased subordinates" who were aware of Mr. Ward's complaint. ECF No. 67 at 18.

Universal acknowledges that Mr. Matthews was aware of Mr. Ward's complaint about discriminatory treatment when Mr. Matthews recommended that Mr. Ward be terminated following the incident on the intercom. DSOMF ¶¶ 90, 123. But Mr. Crosby first learned about Mr. Ward's outburst on the intercom from hourly employees who were confused why the plant was not operating. *Id.* ¶ 84; ECF No. 57-3 at 80. Furthermore, Mr. Matthews was not the only supervisor who was in favor of terminating Mr. Ward. Mr. Ward's direct supervisor, Mike Harmon, also favored termination. DSOMF ¶¶ 82–83. And while Mr. Ward must show that the decisionmakers behind his termination were aware of his complaint of discriminatory treatment to

19

establish a causal connection between the complaint and his termination, *see Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015) ("The plaintiff . . . cannot establish . . . a causal connection without some evidence that the [decisionmakers] knew of the plaintiff's protected conduct at the time they acted."), such a showing is not sufficient to establish a causal connection.

In other words, even if the key decisionmakers knew of Mr. Ward's past complaint of racial discrimination at the time they decided to terminate him, Mr. Ward would still need to point to facts that would allow a reasonable jury to conclude those decisionmakers terminated him because of his past complaint. But Mr. Ward lacks any evidence that he was terminated because of his complaint of race-based discrimination. As explained, Mr. Ward's proffered comparator, Dylan Pareso, was not similarly situated to Mr. Ward, and the supposed allegation regarding Mr. Harmon bears no temporal or circumstantial connection to Mr. Ward or his termination. Because the record clearly shows Mr. Ward was terminated because of his outburst on the intercom on September 8, 2022, and not because of his complaint of racial discrimination, Mr. Ward has failed to establish a prima facie case of retaliation under Title VII, the PHRA, or § 1981.

### 2.    Mr. Ward Cannot Establish That Universal's Proffered Reasons Were a Pretext for Discrimination.

Even assuming *arguendo* that Mr. Ward could show a prima facie case of retaliation, Universal offers a legitimate, non-retaliatory reason for Mr. Ward's termination—his repeated insubordination. And, as noted, it is undisputed that Mr. Ward was repeatedly insubordinate. ECF No. 57-7 at 42–44, 61–62. Accordingly, to establish pretext, Mr. Ward must point to evidence that would allow a reasonable jury to "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005).

As explained, Mr. Ward can point to neither.  His attempt to invoke Dylan Pareso as a comparator and his argument regarding Mr. Harmon are insufficient for a reasonable jury to conclude Universal's proffered reason for Mr. Ward's termination was pretextual.

## V.    Conclusion

For the foregoing reasons, Defendant Universal's Motion to Strike Plaintiff's Statement of Material Facts and Motion for Summary Judgment will be GRANTED.  Accordingly, Mr. Ward's Title VII, PHRA, and § 1981 claims will be dismissed, and judgment will be entered in Universal's favor.

DATED this 25th day of March, 2026.

BY THE COURT:


/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge


cc (via ECF email notification):

All Counsel of Record

21